Filed 5/10/13  P. v. Lee CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>OZRO ROBERT LEE,<br><br>    Defendant and Appellant. | G046971<br><br>(Super. Ct. No. 11WF0938)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Gary S. Paer, Judge.  Affirmed.

Marilee Marshall, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Melissa Mandel and Laura A. Glennon, Deputy Attorneys General, for Plaintiff and Respondent.

*        *        *

A jury convicted defendant Ozro Robert Lee of first degree residential burglary (Pen. Code §§ 459, 460, subd. (a); count 1),[1] indecent exposure after unlawful entry (§ 314, subd. (1); count 2), and two counts of child annoyance after trespass (§ 647.6, subd. (b); counts 4 and 5).[2] The court sentenced defendant to four years in prison.

On appeal defendant contends his child annoyance convictions must be reversed for insufficient evidence and that all the convictions must be reversed for jury instructional error. We agree the court erroneously instructed the jury that the People were not required to prove defendant's motive for any crime. The error, however, was harmless beyond a reasonable doubt. We therefore affirm the judgment in its entirety.

FACTS

On April 15, 2011, S.N. lived with her granddaughters — T.N. (who was nine years old at the time of trial) and D.H. (who was seven years old at the time of trial). S.N. had suffered a stroke the previous year and consequently had speech problems and partial paralysis on one side of her body.

Barney Saldana lived across the street from S.N. On April 15, 2011, defendant stopped by Saldana's house unannounced just before dark to offer Saldana a job. Defendant parked his truck in front of S.N.'s house. He had a white poodle with him. T.N. and D.H. were playing in their front yard.

Saldana had to check his work schedule at his boss's house to see if he could accept defendant's job offer. Saldana told defendant he would be right back. He told defendant to wait in front of Saldana's house and said defendant could urinate in

---

[1] All statutory references are to the Penal Code unless otherwise stated.

[2] The court granted the People's motion to dismiss an aggravated assault charge against defendant.

2

Saldana's side yard or use the restroom if he talked with Saldana's brother. Then Saldana went across the street and two houses down, leaving defendant alone in front of Saldana's house.

Across the street in S.N.'s house, S.N. and D.H. were watching television in S.N.'s bedroom. T.N. was in the living room and heard a knock at the door. Both the front door and the screen door were closed and locked. T.N. looked out a window and saw defendant at the door with a screwdriver and a little white dog. T.N. did not open the door. Under the house rules, she was not allowed to open the door to strangers. She told S.N. there was a stranger at the door.

On cross-examination, T.N. stated she had seen the puppy "earlier" when she was playing in the front yard. She petted the dog "in the outside of the door" and she and D.H. played with it in the living room. T.N. asked the man if she could pet the dog because it was white and fluffy. In the living room, the man said she could play with the puppy. T.N. did not know how defendant or the dog entered her home, but believed defendant might have used a screwdriver to get in the house.

D.H. testified she did not let the man into the house. She was watching television with her grandmother. She saw the little dog outside the house before she saw the man inside the house. When the man came in the house, D.H. was outside with her sister, but they were not playing with the dog.

While S.N. was in the bedroom, she saw a man she did not know with a dog go into the bathroom. S.N. got out of bed and walked into the hall outside her bedroom. D.H. was hiding behind S.N.'s legs. T.N. was right in front of S.N. and saw the man urinate in the bathroom. The man was in the bathroom about two feet away. His pants were down, his penis was hard, and he started masturbating. Defendant faced S.N. as he masturbated and looked at her and the girls. While masturbating, he walked toward S.N. S.N. backed up to get away from him. Defendant was in the house for between 10 to 20 minutes. He pulled up his pants and ran or quickly walked out of the house.

3

S.N. phoned her daughter, N.N., and put D.H. on the phone. D.H. told N.N. that someone came in the house and "T.N. let him in." T.N. got on the phone, N.N. asked her if she let someone in the house, and T.N. said no and that the man had a screwdriver. N.N. called her niece, and told her to go to the house to "see about this guy because [N.N.] was told somebody let him in to use the bathroom."

The niece went to S.N.'s house with her boyfriend, his brother, and his friend. They saw a man in a truck parked outside the house. The man "was wiping his hands off on a white t-shirt." S.N., angry and yelling, moved her hand back and forth in a masturbation motion. T.N. and D.H. were frightened and crying. The niece called the police after the girls and S.N. told her what had happened. The niece told the 911 operator that the girls let someone in the house to use the bathroom.

The girls pointed outside and said, "That's him. Don't let him leave." Defendant started his engine and drove off, but the niece's boyfriend chased him down the street and told him to come back. Defendant made a U-turn and parked in front of S.N.'s home. Defendant got out of his car holding a puppy and said, "Yeah, the girls, they wanted to see my puppy."

The police arrived. Defendant initially complied with an officer's order to put up his hands, but then dropped his hands toward his waistband. The officer, seeing a large metal object in defendant's rear pocket, took out his handgun and again asked defendant to put up his hands. Defendant complied. Defendant's jeans were oversized and "real baggy." His belt dangled from only two belt loops and its large metal buckle hung down in front of his pants. The pant zipper was open.

S.N.'s female friend walked from S.N.'s porch toward the officer, pointed at defendant, and said, "That's him." Defendant said he had done nothing wrong and that the girls just wanted to see his dog.

An officer searched defendant and found a large wrench in his rear pocket, some small tools, a folding knife, and paperwork. Defendant's truck had a tool box

across the bed. The tool box had two compartments with padlocks. One compartment was unlocked, with its padlock hanging open. In the unlocked compartment, a clean 12-and-one-half-inch screwdriver lay atop other dirty tools. The other tools were arranged facing the same way, so that the screwdriver laid across them looked out of place.

T.N. told the officer she was watching television in the front room when she heard a sound like metal scratching on the security screen door and then saw defendant enter the living room with a large screwdriver which she thought he used to open the screen door. T.N. identified the screwdriver found in the truck's tool box as the screwdriver she saw in defendant's hands.

Saldana testified he returned to his house less than 15 minutes after leaving defendant in his yard, but found defendant gone. Saldana's father told Saldana he thought defendant had gone across the street to the neighbors' house to show them a puppy. The father asked whether defendant knew the neighbors because defendant had "just walked right in."

In a police interview, defendant's first statement was, "I was at the wrong place at the wrong time." Several times during the interview he said that the girls loved his puppy and wanted to play with it. Defendant knew the girls' ages and ethnicity, and that they were sisters. He did *not* say he went in the house to use the bathroom.

Although there were pry marks on the front screen door, a forensic scientist determined they were pre-existing marks, not made by the screwdriver found in defendant's tool box.

DISCUSSION

*Substantial Evidence Supports the Child Annoyance Convictions*

Defendant contends no substantial evidence supports the factual findings (necessary for conviction of child annoyance after trespass) that he entered the house

5

without consent, directed his conduct at a child, and was motivated by an unnatural or abnormal sexual interest in a child. The Attorney General counters that defendant either broke into the house or entered it under the guise of a ruse, and directed his conduct toward the girls, motivated by an attraction to them.

On appeal we "determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.' [Citation.] Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 318-319, fn. omitted.) We review the whole record "'in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'" (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206; *People v. Johnson* (1980) 26 Cal.3d 557, 578.) To be substantial, evidence must be "reasonable, credible, and of solid value." (*Id.* at p. 578.) "Perhaps the most fundamental rule of appellate law is that the judgment challenged on appeal is presumed correct, and it is the appellant's burden to affirmatively demonstrate error." (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.)

The crime of child annoyance after trespass occurs when a person enters an inhabited house without consent and annoys or molests a child under age 18. (§ 647.6, subds. (a)(1), (b).) The offense "does not require a touching" (*People v. Lopez* (1998) 19 Cal.4th 282, 289), but it does require conduct that would unhesitatingly irritate a normal person and that is motivated by an unnatural or abnormal sexual interest in the child victim (*ibid.*). The test is an objective one and asks whether the defendant's conduct would unhesitatingly irritate or disturb a normal person, *not* whether the child was actually irritated or disturbed. (*Id.* at p. 290.)

6

Defendant contends T.N.'s testimony on the issue of consent was internally inconsistent and contradictory. He suggests T.N. denied that she let him into the house because she did not want to disappoint or upset her family by having broken the house rule against admitting strangers. He also points to D.H.'s contradictory testimony, as well as to the statements of N.N. and the niece that the girls let him into the house to use the restroom. Alternatively, defendant contends "stronger evidence suggested" he directed his conduct toward S.N., *not* the girls, and that "nothing suggested that [his] conduct was motivated by an unnatural or abnormal sexual interest in the child[ren]."

Conflicts in the evidence are for the jury to resolve. (*People v. Friend* (2009) 47 Cal.4th 1, 41.) "'[I]t is not a proper appellate function to reassess the credibility of the witnesses.'" (*Ibid.*) "'"'To warrant the rejection of the statements given by a witness who has been believed by the [trier of fact], there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions.'"'" (*Ibid.*)

Here, the jury may have believed T.N.'s testimony she did not let defendant into the house.[3] T.N.'s account that defendant broke into the house, possibly using a screwdriver, was not physically impossible or obviously false without resort to inferences or deductions. T.N. repeated this account to N.N., the niece, and a police officer immediately or soon after the incident. The clean screwdriver that looked out of place in defendant's tool box corroborated T.N.'s statement. The jury could infer from the evidence that T.N. did not break the house rule against admitting strangers, that defendant entered the house without consent and then used his dog to distract T.N. or both the girls, or that T.N. played with the dog when she and D.H. were playing in the front yard. Although T.N. was qualified to be a witness despite her young age (Evid. Code, § 700),

---

[3] Alternatively, the jury may have found T.N. let him in, but her consent did not qualify as legal consent.

the jury might have attributed her inconsistencies and intermittent lack of clarity to her age and yet believed her on the issue of lack of consent.

As to defendant's directing his conduct at the girls due to an unnatural sexual interest in them, S.N. testified defendant looked at both her *and* the girls when he was masturbating only two feet away from them. The jury could infer from this evidence that defendant sought to intimidate S.N. so she would not interfere with his conduct directed at the girls. In addition, defendant knew the girls' ages and that they were sisters. The girls were in the yard when he parked in front of their house. This evidence suggests he entered the house due to his sexual interest in the girls. No evidence showed he knew that an adult female was inside the house before he entered it.

In sum, the evidence was sufficient to support the child annoyance convictions.

*The Court Properly Instructed the Jurors on Legal Consent, but Erroneously* (*Albeit Harmlessly*) *Instructed Them on Motive*

Defendant challenges two jury instructions given in this case. We address each challenge individually below, but first summarize the relevant law on instructional error.

A trial court bears a sua sponte duty to instruct the jury on "'"the general principles of law relevant to the issues raised by the evidence"'"" (*People v. Breverman* (1998) 19 Cal.4th 142, 154), including the elements of an offense (*People v. Flood* (1998) 18 Cal.4th 470, 479-480 (*Flood*)). This includes the mental elements of a crime. (*People v. Cole* (2004) 33 Cal.4th 1158, 1210-1211.) "The prosecution has the burden of proving beyond a reasonable doubt each element of the charged offense." (*Id.* at p. 1208.) "An instructional error relieving the prosecution of its burden violates the defendant's rights under both the United States and California Constitutions." (*Ibid.*) When a jury asks a trial court for guidance, the judge must provide the jurors with "a

8

lucid statement of the relevant legal criteria." (*Bollenbach v. United States* (1946) 326 U.S. 607, 612.)

We independently review assertions of instructional error. (*People v. Lamer* (2003) 110 Cal.App.4th 1463, 1469.) "An appellate court reviews the wording of a jury instruction de novo and assesses whether the instruction accurately states the law." (*People v. O'Dell* (2007) 153 Cal.App.4th 1569, 1574.) "[N]o particular form is required as long as the instructions are complete and correctly state the law." (*People v. Andrade* (2000) 85 Cal.App.4th 579, 585.) Even if the defendant failed to object below, an appellate court may review instructional error "if the substantial rights of the defendant were affected thereby." (§ 1259.)

""[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction."" (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248.) "When considering a claim of instructional error, we view the challenged instruction in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner." (*People v. Houston* (2012) 54 Cal.4th 1186, 1229.) We presume that jurors are intelligent and capable of correctly understanding, correlating, applying, and following the court's instructions. (*People v. Lewis* (2001) 26 Cal.4th 334, 390; *People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

A trial court's failure to instruct the jury on all elements of an offense is a constitutional error "subject to harmless error analysis under both the California and United States Constitutions." (*Flood*, *supra*, 18 Cal.4th at p. 475.) "[S]uch an error, like the vast majority of other constitutional errors, falls within the broad category of trial error subject to *Chapman* review." (*Id.* at p. 503) Thus, for this type of error, we inquire whether it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman v. California* (1967) 386 U.S. 18, 24.)

9

*Motive Element of Child Annoyance Offense*

The court instructed the jurors on the elements of the offense of child annoyance, including the requirement that the defendant's conduct be "motivated by an unnatural or abnormal sexual interest in the child." (CALCRIM No. 1121; *In re Gladys R.* (1970) 1 Cal.3d 855, 867-869.) But the court also instructed the jury, in a general instruction not specific to any particular crime, that the People were "not required to prove that the defendant had a motive to commit any of the crimes charged. In reaching your verdict, you may, however, consider whether the defendant had a motive." (See CALCRIM No. 370.)

On appeal defendant contends the court should have clarified to the jurors that CALCRIM No. 370 does not apply to the offense of child annoyance. He asserts the court's failure to do so removed the motive element from the child annoyance charge and thereby violated his constitutional rights.

We agree the court erred by failing to modify CALCRIM No. 370 to exclude child annoyance. Nonetheless, the error was harmless beyond a reasonable doubt. At the close of evidence, prior to instructing the jurors, the court described to them the next stage of the proceedings, saying it would read them the law and give them "the *menus* that apply to these different charges." (Italics added.) In one of the first instructions the court read to the jurors, it admonished them to "[p]ay careful attention to all of these instructions and consider them together." Another initial instruction read by the court stated: "The People must prove not only that the defendant did the acts charged, but also that he acted with a particular intent and/or mental state. The instruction for each crime and allegation explains the intent and or mental state required." The court then instructed the jury that the crimes of burglary, annoying a child, and annoying a child in a dwelling require a specific mental state and that, as to these crimes, the defendant "must not only intentionally commit the prohibited act but must do so with a specific intent and/or mental state. The act and the specific intent and/or mental state

10

required are explained in the instruction for that crime. [¶] Those are those menus I told you about. We are going to get to those pretty soon." Immediately after giving CALCRIM No. 370 (stating that the People need not prove a motive to commit any of the charged crimes), the court told the jury, "Now I'm going to tell you about the menus. The little checklists for each charge." The court subsequently instructed the jury that to prove defendant guilty of annoying a child in an inhabited dwelling, the People had to prove his "conduct was motivated by an unnatural or unnormal [*sic*] sexual interest in the child." Later, the prosecutor, in her closing argument, discussed the requirement for felony child annoyance that the defendant's conduct be "motivated by an unnatural or abnormal sexual interest in a child." She argued, "How do you know that his conduct was motivated by an interest in them? Because that is why he went there. He saw them playing outside. He goes to the door with the dog. That is his candy. That is getting him in." "He is targeting the children."

No reasonable jury would be confused under these circumstances. The court carefully led the jurors through the process and alerted them they would hear a "checklist" or "menu" of the elements of each charge. We presume the jurors were capable of correlating the instructions, i.e., of prioritizing the specific instructions over the general ones, and following the instruction (repeated several times) that the People had to prove the mental state, i.e., the motivation, required for child annoyance after trespass. The error was harmless beyond a reasonable doubt.

Defendant relies on *People v. Maurer* (1995) 32 Cal.App.4th 1121 (*Maurer*), where the Court of Appeal reversed two convictions for misdemeanor child annoyance because the trial court properly instructed the jury that the defendant's conduct had to be motivated by an unnatural or abnormal sexual interest in the victim, but then, in another instruction (CALJIC No. 2.51), told the jury that "'[m]otive is not an element of the crime charged and need not be shown.'" (*Id.* at p. 1125.) The Court of Appeal concluded "the trial court erred in providing these conflicting instructions on this

11

mental state element" (*ibid*.) and further held, "On the state of this evidence, we cannot say the error in providing CALJIC 2.51 . . . was harmless beyond a reasonable doubt" (*id.* at p. 1131). In reversing, the appellate court stated, "We must bear in mind that the audience for these instructions is not a room of law professors deciphering legal abstractions, but a room of lay jurors reading conflicting terms." (*Id.* at p. 1127.)

Our case is distinguishable from *Mauer* because, here, the jurors were provided with more guidance than simply two contradictory instructions. In contrast, *Mauer* mentions no other jury instructions given on the issue, nor does the opinion clarify whether CALJIC No. 2.51 was given as to child annoyance specifically or as to all the charged crimes generally.

Moreover, *Mauer's* harmless error analysis should be limited to its unique set of facts. *Mauer* essentially concluded it was a close case whether the defendant was motivated by an abnormal sexual attraction to the victim; therefore, the court could not say the "'erroneous instruction "must have made no difference in reaching the verdict obtained."'" (*Mauer*, *supra*, 32 Cal.App.4th at p. 1131.) The defendant in *Mauer* was the high school teacher of his female student victim. (*Id.* at p. 1124.) The appellate court stressed that the defendant's two child annoyance convictions arose from (1) his joining a conversation between the victim and another classmate and talking about his sexual "experience with an *older* woman," and (2) his talking (after the victim *pried* the details out of him) about a sexual dream involving the victim. (*Id.* at pp. 1130-1131.) The evidence showed that the victim and the defendant "were confidants and freely discussed sexual and nonsexual matters, sometimes in a counseling mode. [The victim] frankly and openly discussed sexual matters with others. Defendant and [the victim] were very close and spent a lot of time privately, yet defendant never touched her in a sexual manner and never tried to seduce her. Defendant's sexual comments were almost always made in front of the whole class, which included boys as well as girls, and were usually uttered in a joking way." (*Id.* at p. 1131.) The Court of Appeal concluded that, "it is tenable, on

12

this evidence, that a juror here could have determined that defendant's conduct was motivated by other than an unnatural or abnormal sexual interest in" the victim. (*Ibid.*) The appellate court therefore held the error could not be deemed harmless beyond a reasonable doubt. (*Id.* at p. 1127.) *Mauer* is distinguishable from the case at hand, given the nature of the *Mauer* defendant's conduct (talking) and his relationship with the high school student victim.

*Definition of Legal Consent*

Defendant contends the court, by instructing the jury with CALJIC No. 1.23 defining legal consent, removed from the jury's consideration the element of nonconsensual entry into the house. This element was necessary for his convictions of indecent exposure after unlawful entry, child annoyance after trespass, and first degree burglary predicated on the first two felonies.

During the jury's deliberations, the jurors asked the court for the "legal definition of consent with regard to . . . indecent exposure and . . . annoying a child in a dwelling." Because "CALCRIM does not have a separate definition of consent," the court gave the jury CALJIC No. 1.23, modified as follows: "To consent to an act or transaction, a person (1) must act freely and voluntarily and not under the influence of threats, force or duress; (2) must have knowledge of the true nature of the act or transaction involved; and (3) must possess the *mental capacity to make an intelligent choice* whether or not to do something proposed by another person. [¶] Consent requires a free will and positive cooperation in act or attitude." (Italics added.)

The court gave the jury CALJIC No. 1.23 over defense counsel's objection to the third prong. Defense counsel argued the jury might "automatically" think that no child has the mental capacity to make an intelligent decision. Defense counsel requested instead that the jury be instructed with the definition of "consent" contained in section 261.6. Section 261.6 provides in relevant part: "In prosecutions under Section 261, 262,

13

286, 288a, or 289 [respectively concerning rape, spousal rape, sodomy, oral copulation, or penetration by foreign object], in which consent is at issue, 'consent' shall be defined to mean positive cooperation in act or attitude pursuant to an exercise of free will. The person must act freely and voluntarily and have knowledge of the nature of the act or transaction involved." The court denied defense counsel's request, noting that section 261.6 defines consent for purposes of certain sex crimes, but "we are talking about a burglary aspect or the entering of a building aspect, not a sex crime aspect."

On appeal defendant contends the third prong of CALJIC No. 1.23's definition of consent allowed the jury to find T.N. lacked the mental capacity to intelligently choose to let him in the house and therefore lessened the prosecution's burden of proof on that element. But defendant offers no legal authority or analysis as to why the mental capacity requirement should be eliminated from the definition of consent for purposes of felony indecent exposure and felony child annoyance. Defendant simply argues that the court, by giving CALJIC No. 1.23, was "*effectively telling* the jury . . . that [T.N.] did not possess the mental capacity to make an intelligent choice as to whether to let [him] into the house." (Italics added.) This is not true; the court did not tell the jury how to decide the issue. Rather, CALJIC No. 1.23 allowed the jurors to assess for themselves whether T.N. had the requisite mental capacity. The jurors watched and heard T.N. testifying at trial. They heard an officer's testimony that when he interviewed T.N. soon after the incident, T.N. was "very articulate" and "seemed very intelligent for her age," "very sharp" — evidence contravening defendant's assertion the jurors would automatically assume T.N. lacked the necessary mental capacity. A treatise cites CALJIC No. 1.23 for the definition of a victim's "consent" as a defense where lack of consent is an element of the crime. (1 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Defenses, § 98, p. 545.) A separate instruction, CALJIC No. 1.23.1 defines "consent" without the third prong, but only for purposes of rape, sodomy, unlawful penetration, oral copulation, or murder. (Use Note to CALJIC No. 1.23.1. (2012) p. 34.)

14

The court had an obligation to fully answer the jury's question.  The court properly instructed the jury with CALJIC No. 1.23.


DISPOSITION


The judgment is affirmed.


IKOLA, J.

WE CONCUR:


FYBEL, ACTING P. J.


THOMPSON, J.